UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v-

DUANE HOLLENBECK

**DEFENDANT'S SENTENCING MEMORANDUM**
CASE NO.: 23-CR-76 (BKS)

---

### PRELIMINARY STATEMENT

On March 15, 2023 Duane Hollenbeck pled guilty to a one-count information charging him with Possession of an Unregistered Firearm in violation of 26 U.S.C. § 5841, 5861(d), and 5781. Hollenbeck is scheduled to be sentenced on July 13, 2023. In anticipation of sentencing, a Pre-Sentence Report (hereinafter "PSR") was prepared by the Probation Department. The PSR calculates the total offense level to be 21, with a criminal history category of II. The PSR provides that this results in a Guideline range of imprisonment of 41-51 months. This memorandum is submitted on behalf of Duane Hollenbeck to aid the Court's review of the sentencing Guidelines and in support of his motion for a below-Guideline sentence to run concurrently with his anticipated state sentence.

### ARGUMENT

**I.      Role of the Guidelines**

The Supreme Court's decision in *Booker* held that the Guidelines are merely advisory, empowering the courts to take a more holistic approach in assessing the defendant and in determining an appropriate sentence. *See United States v. Booker*, 543 U.S. 220 (2005). The requirement that the courts must consider the sentencing Guidelines is balanced by Congress's mandate that courts impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). The Guidelines are not a substitute, and cannot be used as a substitute, for the sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors. *Nelson v. United States*, 129 S. Ct. 890 (2009); *Spears v. United*

*States*, 129 S. Ct. 840 (2009). Specifically, the Court in *Nelson* held that "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson*, 129 S. Ct. 890, 892. Going even further, the Court clarified the role of the Guidelines, "the Guidelines are not only *not* mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* A sentencing court may not rely on the Guidelines range as a default to be imposed, unless a basis exists to impose a sentence within that range. Instead, the court must weigh the statutory factors in imposing a sentence that constitutes the least amount of imprisonment necessary.

II.     **Duane's background and characteristics**

Some of Duane's most prized possessions are the memories he has of his parents. With both parents now deceased, these memories are incredibly important to him. Duane fondly remembers spending time with his dad at the family camp in North Pitcher. An avid hunter and outdoorsman, Duane's dad regularly brought Duane to the camp to shoot guns. Duane thoroughly enjoyed this time with his dad, as he felt close to his dad when they spent time together, and with the added benefit of time away from his older sisters who would often gang up on him. Duane was never a fan of hunting, as he couldn't imagine shooting an animal. But he did enjoy target shooting, and spending quality time with his dad. The time the two spent at the cabin contributed to their close relationship, a relationship which Duane hopes to recreate with his own sons.

When Duane was only 8 years old, he was at the deli with his mother when a woman engaged his mother in conversation. During the conversation, the woman remarked, "oh that's right, this one isn't yours is he?" Duane was taken aback by this comment, as he never imagined he was anything but their biological son. Later that night, Duane's mom and dad sat him and down and revealed that they had adopted him when he was just six months old. His parents did not give him any further information on who his biological parents were, or what the circumstances were behind his adoption. Duane never saw any paperwork related to his adoption, and never knew if he could find out who his biological parents were.

Duane believes his parents did keep paperwork related to the adoption, but that his older sister Diane took it when his parents passed away. Diane has refused to share this information with him. Later on in life, Duane did an ancestry DNA kit to see if he had any biological siblings. When he received a list of people with close DNA matches to his, he reached out to them. Only one person ever emailed him back. To this date he still has no information about his biological parents or siblings, which also means he has no information about any potential hereditary medical conditions or familial mental health history. He will most likely never know who his biological parents are, or the circumstances surrounding his adoption, making his adoptive parents the only true parents he ever knew.

After Duane's parents passed away, his relationship with his sisters soured, as they refused to involve Duane in handling the estate. Duane learned that his sisters had sold the childhood home without even asking him if he wanted to buy it. He had to beg his sisters just to be able to get a truck that he had helped his dad pick out, and they still insisted that he pay for it. They drained his father's bank account, and kept him in the dark about important decisions related to the estate. They did not want Duane to have any of his parent's possessions, even ones with sentimental value. Duane did inherit the family camp, for which he was very grateful. The camp was exceptionally special to Duane, as he had spent a significant amount of time there with his dad.

Growing up, Duane could spend hours upon hours taking things apart and putting them back together. Duane loved to figure out how things worked- VCRs, TVs, radios, cars, anything that could be tinkered with, analyzed, and put back together. He often fixed things for his family and friends, never taking any payment for it. His curiosity as to how things worked grew through the rest of his life, and he was constantly adding to the list of things he was able to fix. It comes as no surprise that this hobby eventually evolved to include tinkering with guns. Like many other things, Duane enjoyed taking them apart and putting them back together, and he eventually stumbled upon kits online where he could put together his own guns.

Duane will be the first to admit that he is not a hunter, he can't stomach the thought of shooting an animal. He does, however, like to shoot targets. At the camp, he kept various types of targets to shoot including clay pigeons, paper targets, and soda cans. Wanting to recreate the memories he had with his dad, Duane brought his two sons to the camp to shoot as well. Having lost both his parents, having been alienated by both his sisters, and enduring a tough divorce from the mother of his children, it was very important to Duane that he remain close with his children.

Since he so fondly remembered shooting at the camp with his dad, Duane thought that would be a good way to bond with his own kids. Duane ordered kits online consisting of separate parts that he would put together at the camp. This satisfied his curiosity as to how the guns worked, and he would shoot targets outside with his sons. Duane put together several guns for use at the camp, and never had any intentions that the guns would be used for anything other than target practice. He never sold any of the guns he made, and he used them solely for target practice.

### III.     Nature of the Offense

In the summer of 2022, a suspicious activity report was generated due to weekly ammunition purchases lasting over a month, made by a 19-year-old relative of Duane's. PSR ¶6. As part of their investigation, law enforcement located this individual's Instagram account, and found a photo depicting a minor male holding two AR-15 style rifles, one of which appeared to have a shortened barrel. PSR ¶7. Law enforcement interviewed the 19-year-old, who informed law enforcement that the firearms in the photo were located at Duane's camp in North Pitcher, and provided written consent to law enforcement to search the camp. PSR ¶8.

Law enforcement searched the camp and found a short- barreled AR-15 style rifle, with no part of the rifle having a serial number. PSR ¶9. The barrel was measured and determined to be 11.375 inches in length, with the overall length of the rifle being 30.5 inches. PSR ¶9. Since the barrel length was less than 16 inches, it qualified as a short-barreled rifle which was required to be registered in the National Firearm Registration and Transfer Record.

Other firearms were located at the camp, including rifles, shotguns, handguns, and silencers. PSR ¶10. The following day, the 19-year-old voluntarily went to the New York State Police barracks in Norwich to be interviewed by investigators. PSR ¶11. He told investigators that neither he nor Duane had a pistol permit, that they had begun building firearms three to four years prior, and that Duane had purchased the components for the firearms and built them at the camp. PSR ¶11. The 19-year-old also revealed that there were more firearms that were missed during the consent search. PSR ¶12. Law enforcement recovered the additional firearms referenced in this interview. PSR ¶12.  Law enforcement also recovered an additional handgun that they learned about when interviewing a 15-year-old relative of Duane's. PSR ¶13.

Law enforcement contacted Duane that same day and asked him to come down to the barracks as well. Duane voluntarily went to meet with investigators, waived his *Miranda* rights, and agreed to speak with the investigators. PSR ¶14. During his interview, Duane told investigators that one of his hobbies was building firearms with his children, and that he purchased the components for the firearms from several online companies. PSR ¶14. Duane provided information about all the firearm components he bought online, where he bought them from, and what he was doing with them. He further admitted to building the short-barreled rifle. PSR ¶14. Throughout his interview, Duane was candid and forthcoming. He never minimized his own activity, and he was cooperative with agents. He answered all of their questions, and provided accurate information. At that point in time, Duane truly did not know that he had committed a crime, as he was completely unaware that he was required to register the short-barreled rifle.

Although not an element of the offense, Duane's lack of knowledge that he had to register the short-barreled rifle is an important fact to consider in this case. Duane didn't fail to register the short-barreled rifle because he wanted to hide what he was doing, he failed to register it simply because *he didn't know he needed to*. Duane has never concealed the fact that he liked to put together guns and take his kids shooting at the family camp. His ex-wife knew about his hobby, his current fiancé knew

about his hobby, his neighbors knew about it, and he was truthful to law enforcement about it when interviewed. Hollenbeck even advised law enforcement of his possession of a firearm in October of 2021, after he was interviewed by FBI agents regarding a Facebook posting.

### IV. Numerous factors demonstrate that a below-Guideline sentence is appropriate

#### a. Duane had a non-criminal motive in committing the offense

While the law holds Duane accountable despite his lack of knowledge, it is still an important factor that must be considered when imposing a sentence. Duane's possession of an unregistered short-barreled rifle was the result of his attempt to spend quality time with his kids, in a similar way to how he spent quality time with his dad. Duane never used the short-barreled rifle, or any other firearms, for any nefarious purposes, nor did he ever sell or transfer the firearms he made at the camp. Duane's entire reason for possessing the short-barreled rifle was to bond with his kids at the family camp, and not to commit any crimes. His possession of the short-barreled rifle for a non-criminal motive is an important sentencing consideration. *See, e.g., United States v. Williams*, 432 F.3d 621 (6th Cir. 2005) (below-guideline sentence of 24 months appropriate in part because defendant possessed the firearm for self-defense in light of threats he received).

Motive's role in sentencing is to distinguish between relative blameworthiness of people convicted of the same criminal offense. *See* Carol S. Steiker, *Punishing Hateful Motives: Old Wine in a New Bottle Revives Calls for Prohibition*, 97 MICH. L. REV. 1857, 1866 (1999). ("Just as the existence or degree of criminal liability can often turn on a normative evaluation of the defendant's reasons for acting, so too the degree of punishment imposed after a finding of criminal liability often turns on such an evaluation."). Motive is a crucial consideration as it relates to the theories of punishment. Under all theories of punishment, An individual who acted with a non-criminal motive is deserving of a lesser sentence than an individual who didn't. A non-criminal motive is an important consideration under the retribution theory of punishment, where a person is punished because they deserve it, and where the amount of punishment must be proportional to the gravity of

the offense itself. In this regard, motive is entirely critical to determining an individual's blameworthiness, and therefore their sentence. Motive is also important under the deterrence theory, where a specific unit of punishment correlates to a specific number of potential offenders who would now be dissuaded from committing a particular number of crimes. Duane's motive for possessing the firearm was to spend time with his kids. He has been deterred from doing so in this manner now, because his motive can be achieved through other means, which he identifies in his statement of acceptance of responsibility.

Motive similarly plays an important role in the incapacitation theory of punishment. Incapacitation is the idea that imprisonment makes offenders incapable of re-offending for as long as they are imprisoned. Motive may make an individual less likely to reoffend, despite the length of punishment. Here, Duane's main motive was to spend time with his kids, something he can do without engaging in any further criminal conduct. Finally, motive is a consideration in the rehabilitation theory of punishment, which justifies punishment as a method of modifying a person's behavior with the goal of decreasing their likelihood of reoffending. Motive's role in punishment under the rehabilitation theory is that determining the individual's motive may be the key to determining whether that person will require treatment, and therefore may require a longer sentence. An individual who possesses an unregistered short-barreled rifle that they use solely to protect themselves when they engage in the sale of controlled substances has different rehabilitative needs than an individual who possesses an unregistered short-barreled rifle because making them was their hobby. Without consideration of motive, Courts run the risk of failing to ensure that similarly situated offenders receive similar punishment. Here, Duane's non-criminal motive in possessing the firearm demonstrates that he is less likely to reoffend, less blameworthy than someone who acted with the intention to commit future crimes, and more likely to be deterred from engaging in this conduct in the future.

### b. Duane is unlikely to reoffend

Duane is unlikely to reoffend for many reasons, with motive being just one. As a fifty-four-year-old man, Duane is statistically less likely to reoffend based on his age alone. Studies have shown that recidivism rates decline relatively consistently as age increases. U.S. SENTENCING COMMISSION, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES (2004) (noting that defendants over the age of forty exhibit markedly lower rates of recidivism when compared to younger defendants); U.S. SENTENCING COMMISSION, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS (2017) (noting that reconviction rate is highest among offenders younger than twenty-one and declines in each subsequent age group with a reconviction rate of 12.2% for defendants who were between the ages of 50 and 59 when they were released).

Duane is also unlikely to reoffend because his current incarceration has deterred him from engaging in any criminal conduct in the future. Duane is a hardworking man who prides himself on being able to take care of his family. Duane has always maintained employment, at times even working two jobs. The time Duane has spent in jail has been time that he has been unable to financially support his family, and the feeling of being helpless in that regard has weighed on Duane for the entirety of his incarceration. Since his arrest, Duane constantly worries about how bills are getting paid, how his fiancé will be able to keep the house out of foreclosure, and how his family can afford basic necessities. Duane wants nothing else than to be able to work and provide for his family, which he knows he cannot do when he is incarcerated. His feelings of helplessness and his persistent worries about his family's financial predicament have been a huge deterrent for Duane. He never again wants to find himself in this situation, and he never again wants his family to have to worry about money because of him. Duane is motivated not to re-offend because he knows that if he does, he will again be separated from his family, and will again agonize over how his absence affects his family.

      **V.**      **This sentence shall run concurrently to his anticipated state sentence**

Duane is currently charged in Chenango County Court with two counts of Criminal Possession of a Weapon in the 3rd degree, stemming from the same seizure of firearms that formed the basis for the federal case. As such, the conduct in the state case is relevant conduct under U.S.S.G. §1B1.3. This is especially so because the PSR applies a four-level enhancement pursuant to U.S.S.G. §2K2.1(b)(1) for the total number of firearms seized, which is a larger number than the one he is charged with federally, and encompasses the firearms he is charged with in his state case. He has yet to be sentenced on his state case, though a sentence to imprisonment is expected. Pursuant to U.S.S.G. §5G1.3(c), the sentence in this case shall be imposed to run concurrently to the anticipated term of imprisonment in the state case.

## CONCLUSION

For the above-listed reasons, a variance from the Guidelines to a below-Guideline sentence to be followed by a period of supervision is sufficient, but not greater than necessary, to achieve the purposes of the Sentencing Reform Act.

DATED: June 22, 2023

Respectfully submitted,

Lisa Peebles
Federal Public Defender

By: Gabrielle DiBella
/s/ *Gabrielle DiBella*
Assistant Federal Public Defender
Bar Roll No. 700576
Office of the Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
(315) 701-0080

cc:   Geoff Brown, AUSA, by ECF
       Duane Hollenbeck, by mail